UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Natasha Jane O'Connor,           )
                                      )
      Plaintiff,           )
                                        )
         v.            )   Case No. 3:18-cv-30013-KAR
                                        )
Nancy A. Berryhill,            )
Acting Commissioner of Social     )
Security Administration,        )
                                        )
      Defendant.        )


MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR JUDGMENT
ON THE PLEADINGS AND DEFENDANT'S MOTION TO AFFIRM THE DECISION OF
THE COMMISSIONER
(Docket Nos. 12 & 21)

ROBERTSON, U.S.M.J.

I.     INTRODUCTION

Natasha Jane O'Connor ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g)

and 1383(c)(3) seeking review of a final decision of the Acting Commissioner of Social Security

("Commissioner") denying her application for Social Security Disability Insurance Benefits

("DIB") and Supplemental Security Income ("SSI").  Plaintiff applied for DIB and SSI on

August 8, 2012, alleging an October 31, 2009 onset of disability due to problems stemming from

the following impairments:  anxiety; panic disorder; agoraphobia; and a "heart problem" (A.R. at

442, 481). [1]  On January 30, 2015, the Administrative Law Judge ("ALJ") found that Plaintiff

was not disabled and denied her application for DIB and SSI (*id*. at 264-294).  The Appeals

---

[1] A copy of the Administrative Record (referred to herein as "A.R.") has been filed under seal
(Dkt. No. 10).

1

Council vacated the decision and remanded the case to the ALJ to further evaluate Plaintiff's mental impairments and their effect on her residual functional capacity ("RFC") (*id.* at 296-97). The Appeals Counsel specifically directed the ALJ to issue a new decision that addressed Plaintiff's abilities to: "understand, carry out and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers, and work situations; and deal with changes in a routine work setting" (*id.*). After a re-hearing on November 8, 2016, the ALJ again found that Plaintiff was not disabled and denied Plaintiff's DIB and SSI claims (*id.* at 85-100). The Appeals Council denied review (*id.* at 1-6) and, thus, the ALJ's decision became the final decision of the Commissioner. This appeal followed.

Plaintiff appeals the Commissioner's denial of her claim on the ground that the decision is not supported by "substantial evidence" under 42 U.S.C. § 405(g). Pending before this court are Plaintiff's motion for judgment on the pleadings requesting that the Commissioner's decision be reversed or remanded for further proceedings (Dkt. No. 12), and the Commissioner's motion for an order affirming the decision of the ALJ (Dkt. No. 21). The parties have consented to this court's jurisdiction (Dkt. No. 15). *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the reasons stated below, the court will grant the Commissioner's motion for an order affirming the decision and deny Plaintiff's motion.

II.    LEGAL STANDARDS

A.    Standard for Entitlement to Disability Insurance Benefits and
       Supplemental Security Income

In order to qualify for DIB and SSI, a claimant must demonstrate that she is disabled

within the meaning of the Social Security Act.[2]  A claimant is disabled for purposes of DIB and

SSI if she "is unable to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than twelve months."  42

U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A claimant is unable to engage in any substantial

gainful activity when she

> is not only unable to do [her] previous work, but cannot, considering [her] age, education,
> and work experience, engage in any other kind of substantial gainful work which exists in
> the national economy, regardless of whether such work exists in the immediate area in
> which [s]he lives, or whether a specific job vacancy exists for [her], or whether [s]he
> would be hired if [s]he applied for work.

 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  The Commissioner evaluates a claimant's

impairment under a five-step sequential evaluation process set forth in the regulations

promulgated by the Social Security Administration ("SSA").  *See* 20 C.F.R. § 404.1520(a)(4)(i-

v).[3]  The hearing officer must determine:  (1) whether the claimant is engaged in substantial

gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the

impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4)

whether the impairment prevents the claimant from performing previous relevant work; and (5)

whether the impairment prevents the claimant from doing any work considering the claimant's

---

[2] There is no challenge either to Plaintiff's insured status for purposes of entitlement to DIB, *see* 42 U.S.C. § 423(a)(1)(A), or to her financial need for purposes of entitlement to SSI, *see* 42 U.S.C. § 1381a.

[3]  The administrative regulations applicable to Title II DIB are found in 20 C.F.R. Part 404, while the regulations applicable to Title XVI SSI are found in 20 C.F.R. Part 416.  Because the Title II and Title XVI regulations do not differ substantively, the court mostly refers to the Title II regulations in this Memorandum and Order.

age, education, and work experience.  *See id; see also Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process).  If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step.  20 C.F.R. § 404.1520(a)(4).

Before proceeding to steps four and five, the Commissioner must assess the claimant's RFC, which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work.  *See id.*

> RFC is what an individual can still do despite his or her limitations.  RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities

Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis, including the burden to demonstrate RFC.  *Flaherty v. Astrue*, Civil Action No. 11-11156-TSH, 2013 WL 4784419, at *8-9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).  At step five, the Commissioner has the burden of showing the existence of jobs in the national economy that the claimant can perform notwithstanding his or her restrictions and limitations.  *Goodermote*, 690 F.2d at 7.

B.     Standard of Review

The district court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing.  *See* 42 U.S.C. § 405(g).  Judicial review "is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence."  *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).  The court reviews questions of law *de novo*, but "the ALJ's findings shall be

conclusive if they are supported by substantial evidence, and must be upheld 'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion,' even if the record could also justify a different conclusion." *Applebee v. Berryhill*, 744 F. App'x 6, 6 (1st Cir. 2018) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222-23 (1st Cir. 1981) (citations omitted). "Substantial-evidence review is more deferential than it might sound to the lay ear:  though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not." *Purdy v. Berryhill*, 887 F.3d 7, 13 (1st Cir. 2018) (quoting *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003)).  In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence.  *See Applebee,* 744 F. App'x. at 6.  That said, the ALJ may not ignore evidence, misapply the law, or judge matters entrusted to experts.  *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

III.    FACTS

Plaintiff alleges that the ALJ erred by:  (1) failing to adhere to her January 2015 step two findings regarding the physical limitations attributable to Plaintiff's back condition; and (2) failing to afford controlling weight to the opinion of a nurse practitioner.  Accordingly, the background information will be limited to facts relevant to those issues and additional pertinent facts will be discussed in the analysis.

A.    Plaintiff's Background

Plaintiff was forty-three years old at the time of the hearing on November 8, 2016 and had a twenty-four year old son (A.R. at 109, 113, 120).  She attended high school through the tenth grade (*id.* at 113).  From 1996 to 2009, she had worked full-time as a phlebotomist and

from February to June 2012, she had been employed as a part-time cashier at McDonald's (*id.* at 113, 482).

B.    <u>Plaintiff's Physical Condition</u>

1.    Treatment Records

On October 29, 2010, Plaintiff went to the Cooley Dickinson Hospital emergency department complaining that she injured her lower back when she stumbled and fell against a coffee table (*id.* at 886). There was no radiation of numbness, tingling, or pain down her leg, but she experienced tenderness over the right paralumbar region (*id.* at 886-87). The frontal and lateral x-rays of Plaintiff's lumbar spine showed "some facet arthropathy of LF-S1, but relatively normal disc spaces and no slippage or other abnormalities [were] seen" (*id.* at 887, 893). She was diagnosed with a lower back contusion and was prescribed Percocet and Soma (*id.* at 887).

The December 11, 2010 x-rays of Plaintiff's thoracic spine were "negative" (*id.* at 614). The radiograph revealed "vertebral bodies [that were] normal in height, contour and alignment," no fracture or other focal skeletal abnormality, intact posterior elements, well-maintained intervertebral disc spaces, and unremarkable SI joints, sacral foramina, and paraspinal soft tissues (*id.*). The November 5, 2012 x-rays also showed that Plaintiff's lumbosacral spine was normal (*id.* at 862).

On June 3, 2014, certified physician's assistant ("PA-C") Svetlana Puzankov of Family Medical Associates ("Family Medical") noted that there was no tenderness to palpation of the facets in Plaintiff's lumbar areas (*id.* at 995). However, Plaintiff's paraspinous muscles and bilateral lumbar areas were tender to palpation (*id.*). Her spinal range of motion was painful in flexion, extension, bilateral rotation, and bilateral lateral bending (*id.*). The seated straight leg raise was negative bilaterally (*id.*). Plaintiff's gait was "intact" (*id.*).

The records of Plaintiff's July 24, 2014 visit to Family Medical indicated that Plaintiff experienced ongoing problems with low and mid-back pain (*id.* at 1004). There was no numbness, paresthesia, weakness, or urinary incontinence (*id.*). Plaintiff indicated that the muscle relaxer helped, especially at night (*id.*). PA-C Puzankov diagnosed lumbago and recommended that Plaintiff continue stretching, applying heat and ice, and taking NSAIDs (*id.* at 1006, 1007). Plaintiff indicated that she was not interested in a physical therapy ("PT") or a chiropractic referral (*id.* at 1006).

The October 21, 2014 MRI of Plaintiff's spine revealed a "small posterior right paramedian disc protrusion that approaches without compressing the traversing right S1 nerve root within the right subarticular zone" (*id.* at 1038). The other disc levels of the lumbar spine were normal (*id.*). "There [was] no severe central canal stenosis and there [was] no severe neural foraminal stenosis within the lumbar spine" (*id.*). Lumbar disc disease was diagnosed based on the MRI results (*id.* at 1037).

The report of Plaintiff's February 29, 2016 visit to Family Medical indicated that Plaintiff walked three to six hours per week for exercise (*id.* at 1137).

2.   Consultative Examination

Paul A. Lagac, M.D. of the University of Massachusetts Medical Center ("UMMC") Disability Evaluation Services evaluated Plaintiff's physical condition on November 1, 2012 (*id.* at 838). According to Plaintiff, she stayed inside the house because her back pain prevented her from walking and engaging in any activities (*id.* at 839). She used a heating pad to relieve the constant pain (*id.* at 838, 839).

Dr. Lagac observed that Plaintiff's gait and flexion, extension, rotation, and lateral flexions of her back were normal (*id.* at 839). "She was able to bend down to 90 degrees" (*id.*).

3. Opinions

a. State Agency Consultants

Based on the medical evidence indicating that Plaintiff's examinations were normal, the state agency consultants, Elaine Hom, M.D. and M. Douglas Poirier, M.D., found Plaintiff's spine disorders to be non-severe in November 2012 and March 2013 respectively (*id.* at 201, 219). Dr. Poirier opined that Plaintiff demonstrated the maximum sustained work capability for "heavy/very heavy" work (*id.* at 224).

b. Svetlana Puzankov, PA-C

On June 3, 2014, PA-C Puzankov of Family Medical completed a form indicating her medical opinion of Plaintiff's physical capability "to do work-related activities on a day-to-day basis in a regular work setting" (*id.* at 976-77). PA-C Puzankov stated that Plaintiff's "chronic hip and back pain" did not limit her ability to lift, carry, stand, walk, sit, and perform postural activities and physical functions (*id.*). There were no environmental restrictions on Plaintiff's ability to perform work-related activities either (*id.* at 977). PA-C Puzankov cited the "unremarkable" x-ray of Plaintiff's lumbar spine as support for her opinion regarding Plaintiff's ability to perform postural activities (*id.*). The Mental Impairment Questionnaire that PA-C Puzankov completed noted the absence of substantial "objective findings" supporting Plaintiff's assertion regarding the severity of her back pain (*id.* at 981).

C. Plaintiff's Mental Condition

1. Treatment Records

On May 4, 2010, Plaintiff presented at the OnCall Urgent Care Center ("OnCall") for a Suboxone treatment intake assessment (*id.* at 706). She reported taking twenty to thirty "oxy's and [P]ercocet" pills daily (*id.*). She was unemployed but hoped to return to her job as a

phlebotomist (*id.*). She began Suboxone treatment at OnCall on May 7, 2010 and the Administrative Record shows that she continued Suboxone treatment through September 27, 2016 (*id.* at 708, 1445).

On July 16, 2011, Plaintiff's boyfriend transported her to the Noble Hospital emergency room upon finding her unresponsive (*id.* at 633). She had overdosed on four medications: Suboxone; Klonopin; Soma; and propranolol (*id.* at 631, 634). Following the recommendations of a psychiatrist and the Crisis Team, she was transferred to a psychiatric facility (*id.* at 631).

In October 2011, Plaintiff reported to Family Medical that her anxiety was "well-controlled" on Klonopin (clonazepam) (*id.* at 696).

An ambulance transported Plaintiff to the Noble Hospital emergency room on February 23, 2012 after she was found walking unsteadily on the side of a road (*id.* at 643, 647). When she arrived at the hospital, personnel observed that she was lethargic and her speech was slurred (*id.* at 646, 647). The discharge diagnosis was a possible drug overdose (*id.* at 658).

Plaintiff's boyfriend brought her to the Noble Hospital emergency department four months later when she suddenly began to shake and had difficulty speaking (*id.* at 663, 665). She was diagnosed with "accidental medication overuse" (*id.* at 673).

During Plaintiff's June 3, 2014 visit to PA-C Puzankov, Plaintiff reported that the medication Family Medical prescribed was working "okay" but she was "having some problems with anxiety 'flares,'" an increase in "panic like symptoms," and "mood lability/irritability" (*id.* at 849, 993). Plaintiff indicated that anxiety and panic were triggered by being in a public setting and often prevented her from leaving home (*id.* at 993). She also reported a history of depression characterized by "anergia, anhedonia, tearfulness, labile mood, hypovegetative symptoms, mental fog, poor memory, poor focus/concentration, and social isolation" (*id.*). PA-C

Puzankov observed that Plaintiff was alert, oriented to time, place, and person, pleasant, cooperative, and "somewhat anxious appearing" (*id.* at 994, 995). The record of Plaintiff's July 24, 2014 visit to Family Medical indicated that Plaintiff felt "okay" on Zoloft and relied on Klonopin throughout the day for relief of panic symptoms (*id.* at 1004). PA-C Puzankov's assessment was that Plaintiff's anxiety was well-controlled by the medication and that her depression was "stable" overall, but she should seek a psychiatrist's care (*id.* at 1006).

According to the April 15, 2015 progress note of Plaintiff's visit to Family Medical, Plaintiff continued to experience "significant anxiety," but the Klonopin, which she took three times daily for "panic," was effective (*id.* at 1125). Inderal (propranolol) also relieved her anxiety and prevented her "otherwise chronic migraines" (*id.*). PA-C Puzankov noted that Plaintiff's anxiety was stable and her depression was improving "with better weather" (*id.* at 1127). PA-C Puzankov made a similar notation the following month (*id.* at 1131).

On May 6, 2015, Tina Newcomb, LMFT, of The Carson Center for Human Services, Inc. ("Carson Center") conducted an outpatient adult comprehensive assessment of Plaintiff for treatment with medication and psychotherapy (*id.* at 1045, 1047, 1052). Plaintiff reported depressive symptoms and anxiety (*id.* at 1047). According to Plaintiff, she had "little appetite, experience[d] racing thoughts, [shook], and [found] going to stores to be overwhelming" (*id.*). She felt like "'nothing work[ed] for her'" (*id.*). Plaintiff reported "severe" financial stress because she was unemployed, a history of trauma, and suicidal ideation (*id.* at 1050, 1051, 1052). Ms. Newcomb diagnosed generalized anxiety disorder and mood disorder NOS and assigned a Global Assessment of Functioning ("GAF") score of 45 (*id.* at 1052).[4]

---

[4] The GAF "scale is used to rate a patient's 'overall psychological functioning.'" *Lopez-Lopez v. Colvin*, 138 F. Supp. 3d 96, 98 n.4 (D. Mass.), *on reconsideration in part*, 144 F. Supp. 3d 260 (D. Mass. 2015) (quoting American Psychiatric Institute, Diagnostic & Statistical Manual of

During a September 2015 visit to Family Medical, Plaintiff reported that her psychological counseling at the Carson Center was "going well" and that Inderal relieved her anxiety somewhat but it was still "hard for her to prepare herself to go out or do things" (*id.* at 1133).

On October 12, 2015, Plaintiff presented at the Noble Hospital emergency room with anxiety symptoms (*id.* at 1092). She was alert and oriented x 4 (*id.* at 1093, 1096).

Plaintiff had her first psychotherapy session with Oleta Shaw, LICSW, of the Carson Center on January 6, 2016 (*id.* at 1054-55, 1057). Ms. Shaw noted that Plaintiff was "[v]ery anxious, depressed, fatigued" (*id.* at 1055). Plaintiff cut her thumb when she was anxious (*id.* at 1056). Ms. Shaw diagnosed generalized anxiety disorder, posttraumatic stress disorder ("PTSD"), mild opioid use disorder in full remission, and anorexia nervosa (*id.* at 1058).

On April 8, 2016, Plaintiff saw APRN Ella Sussman at the Carson Center Medication Clinic (*id.* at 1065, 1461). Plaintiff complained, "'[I] Don't know why I'm still alive – shouldn't wake up feeling the way I feel'" (*id.* at 1065). She described her anxiety symptoms as wanting "'to crawl right out of my skin. I have agoraphobia. I only go where I need to go'" (*id.*). Her thoughts were "'racing all the time'" and she was not able to focus (*id.*). Concerning depression, Plaintiff indicated, "'I'm not happy no matter what happens to me, crying all the time'" and "[s]ometimes" she went for a week without showering (*id.*). She reported that she had been a

Mental Disorders ("DSM-IV") 32 (4th ed. 1994)). "The scale goes from '1,' indicating that the patient has a 'persistent danger of severely hurting self or others,' to '100,' indicating 'superior functioning.'" *Id.* (quoting DSM-IV at 32). "A GAF score of 41-50 indicates 'serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).'" *Id.* at 102 n.7 (quoting DSM-IV at 34).

victim of domestic violence (*id.*). As for cutting her thumb with fingernail clippers and picking the skin, Plaintiff explained that she did it "'to brainstorm, stimulation – [it] does something for me but [I don't know] what it is'" (*id.* at 1066).

Plaintiff told Ms. Sussman that she felt "'a little better with Prozac'" (*id.* at 1065). She planned to attend her brother's birthday dinner at the Olive Garden restaurant with her mother and her brother's girlfriend (*id.*). She cooked, colored, and spent time with her son (*id.*). Ms. Sussman diagnosed generalized anxiety disorder, PTSD, mild opioid use disorder in full remission, anorexia nervosa, restricting type, and obsessive-compulsive disorder ("OCD"), increased Plaintiff's dosage of Prozac, and continued Lamictal and Klonopin (*id.* at 1068-69). Ms. Sussman noted that Plaintiff's "[s]ymptoms may be a function of underlying PTSD, executive functioning deficits, harmful impulsivity, and emotional instability" (*id.* at 1068). When Plaintiff attended a therapy session with Ms. Shaw three days later, she reported becoming increasingly "upset" by her anxiety reactions and social phobias (*id.* at 1064).

During Plaintiff's May 9, 2016 visit with Ms. Sussman, Plaintiff reported having "'massive problems with anxiety'" and insomnia (*id.* at 1216). She attended her brother's birthday dinner but left early because being with "'all the people'" triggered her anxiety (*id.*). Ms. Sussman noted that Plaintiff was "well groomed, . . . [c]alm, cooperative, engaged . . . talkative" (*id.* at 1219). Her mood was anxious and her affect was "stressed, tired" (*id.*). Her thoughts were "coherent" and "organized" (*id.*). Ms. Sussman increased Plaintiff's dosages of Klonopin and Prozac (*id.* at 1221).

Plaintiff was in a "good mood" when she saw Ms. Sussman about a month later on June 13, 2016 (*id.* at 1223). Her affect was euthymic (*id.* at 1226). Plaintiff reported that the

increased dosages of Klonopin and Prozac improved her depression and anxiety, including her ability to sleep (*id.* at 1223).

Plaintiff felt "a little less depressed and anxious" when she saw Ms. Shaw for psychotherapy at the Carson Center on June 27, 2016 (*id.* at 1229). She attributed the improvement to the medication change (*id.*). However, Plaintiff was "very sad" during her visit with Ms. Shaw on July 13, 2016 because the anxiety medication was not as effective as it was initially (*id.* at 1233). Plaintiff planned to conduct internet research to determine if something other than medication would alleviate her anxiety (*id.*).

On July 29, 2016, PA-C Puzankov noted that Plaintiff's anxiety and depression were "stable" (*id.* at 1239). During Plaintiff's Suboxone maintenance visit at OnCall on August 16, 2016, Karyn Schalet, PAC, indicated that Plaintiff's speech and affect were normal (*id.* at 1452-53).

On September 16, 2016, Plaintiff reported to Ms. Sussman that she cried, screamed, and shook at Stop and Shop during the previous week (*id.* at 1486). She also reported insomnia because she had "'so much on her mind'" and was worried about "'everything'" (*id.*). Ms. Sussman noted that Plaintiff's mood was anxious, but she was well-groomed, her affect was "euthymic, baseline," and her thoughts were "coherent [and] organized" (*id.* at 1489). Plaintiff's medications remained the same (*id.* at 1491).

On September 27, 2016, Plaintiff told Laura Mitrowski, PAC, of OnCall that she was doing "alright" and the psychotherapy that she attended every other week was "going very well" (*id.* at 1445). She denied any "complaints or concerns" (*id.*). The next day, Plaintiff told Ms. Shaw that she was "terrified every day" (*id.* at 1481).

### 2.   Consultative Examinations

Leon Hutt, Ph.D. examined Plaintiff on November 6, 2012 (*id.* at 841).  Plaintiff reported that she shopped for food with her mother, cooked for herself, and paid her bills (*id.* at 843).  She indicated that she experienced panic attacks several times each day (*id.* at 844).  Although Plaintiff claimed that she was having a panic attack during the interview, Dr. Hutt did not observe "any significant indications of manifest anxiety and no indications of autonomic hyperactivity" (*id.* at 841, 843).  Dr. Hutt characterized as "overly dramatic" Plaintiff's description of waking up and having panic attacks and crying spells several times each night (*id.* at 843, 844).  The mental status examination revealed that her speech was "generally clear, relevant and coherent but often vague," attentional capacity was fair, and intellectual functioning was in the low average range (*id.* at 843-44).  "There were no indications of impaired memory" (*id.* at 844).  Her affect was "appropriate" and her mood was "mildly dysphoric" (*id.*).  Dr. Hutt provisionally diagnosed panic disorder with agoraphobia and rule out opioid dependence in partial remission and assigned a GAF score of 65-70 (*id.*).[5]  He doubted that Plaintiff "could psychologically tolerate stressors associated with full-time employment" (*id.*).

Dr. Hutt conducted a second consultative examination on February 5, 2013 (*id.* at 855).  Plaintiff reported, "'I do not do anything.  I cannot do anything'" (*id.*).  She indicated that she experienced progressive difficulties with panic attacks and agoraphobia that had started several years earlier (*id.* at 855, 857).  As a result, she was unable to leave the house alone and avoided social settings and crowds (*id.*).  She had about five panic attacks per day and had avoided

---

[5] A GAF score between 61 and 70 reflects some mild symptoms or some difficulty in """social, occupational or school functioning."""  *Viveiros v. Berryhill,* Civil Action No. 1:15-cv-13100-ADB, 2018 WL 3057730, at *5 n.3 (D. Mass. June 20, 2018) (quoting *Rivera ex rel. Z.G.O. v. Astrue,* Civil Action No. 08-11109-GAO, 2009 WL 4063223, at *1 n.3 (D. Mass. Nov. 24, 2009)).

showering for about one year due to fear (*id.* at 856).  Dr. Hutt noted that her hygiene was "suboptimal" (*id.*).  The mental status examination revealed that her speech was "generally clear, relevant, and coherent," her attentional capacity was fair, her intellectual functioning was in the low average range, and her memory was not impaired (*id.* at 856-57).  Dr. Hutt diagnosed panic disorder with agoraphobia and assigned a GAF score of 60 (*id.* at 857).[6]  Dr. Hutt indicated:  "I doubt that she can psychologically tolerate stressors associated with full-time employment at this time.  She might do better if she receives appropriate mental health treatment" (*id.*).

Sheree Estes, Psy.D. of UMMC Disability Examination Services examined Plaintiff on September 24, 2013 (*id.* at 984).  Plaintiff reported that she was not working because her panic attacks would cause her to get fired (*id.* at 986).  Dr. Estes observed that Plaintiff's grooming and hygiene were "adequate" (*id.*).  She was "a bit anxious and nervous" during the evaluation (*id.*).  Her thought processes were logical and her intellectual functioning was estimated to be in the average to low average range (*id.*).  Plaintiff scored 30/30 on the mini-mental status examination, which was in the normal range (*id.* at 987).  Although Dr. Estes indicated that Plaintiff would have difficulty sustaining attention and focus, she noted that Plaintiff's performance on the exam did not reflect any difficulty with attention, concentration, or memory (*id.*).  Dr. Estes opined that Plaintiff did not "require any particular levels of supervision" and could live independently (*id.*).  Dr. Estes diagnosed major depressive disorder and anxiety disorder with panic tendencies and assessed a GAF score of 57 (*id.* at 987-88).

_____

[6] "A [GAF] score in the range of 51–60 indicates '[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).'"  *Lopez-Lopez*, 138 F. Supp. 3d at 98 n.4 (quoting DSM IV at 34).

3.   Opinions

*Treatment Providers*

Elizabeth Saunders, LMHC, Plaintiff's therapist and substance abuse counselor at OnCall, completed substance abuse and psychiatric disorder questionnaires on January 4, 2013 (*id.* at 748, 849, 850-52, 906, 968).  Ms. Saunders indicated that Plaintiff had tested positive for substances seven times in the past two years (*id.* at 849).  On the psychiatric questionnaire, Ms. Saunders described Plaintiff's current mental status as fluctuating with her mood, but within normal limits (*id.* at 850).  Ms. Saunders indicated that there was no evidence that Plaintiff's daily activities, interests, personal habits, or ability to relate to others were restricted (*id.* at 849, 850).  Ms.  Saunders stated that, although Plaintiff's mind raced, she was able to focus and complete tasks and sustain concentration and attention for extended periods without being distracted by psychologically based symptoms and external stimuli (*id.* at 850).  Plaintiff did not have memory deficits and did not require excessive supervision because of forgetfulness, poor decision-making ability, preoccupation, negativism, inability to adhere to a schedule or appreciate safety issues, poor judgment, or episodes of psychiatric symptoms (*id.* at 850-51).  Ms. Saunders further reported that Plaintiff would be able to get along with others, including supervisors and co-workers, and would be able to travel in public (*id.* at 851).  Plaintiff's diagnosis was opiate dependency and GAF score of 54 because of "limited relapses" (*id.* at 850).  Ms. Saunders indicated that Plaintiff's prognosis was "good" (*id.* at 852).  She further noted that OnCall's "clients seem to do much better with a structured schedule" that work provided (*id.*).

PA-C Puzankov completed three assessment forms.  On January 21, 2013, she filled out an adult function report (*id.* at 505-12).  PA-C Puzankov indicated that, at the time she completed the form, she had known Plaintiff for one day because she replaced Plaintiff's

16

previous primary care provider (*id.* at 505).  PA-C Puzankov stated that Plaintiff experienced

insomnia and "panic symptoms" and tended to stay home due to social anxiety, severe chronic

back pain, and severe depression (*id.* at 505, 506).  She was not motivated to engage in personal

care activities, but she prepared her meals each day, cleaned, ironed, vacuumed, and went food

shopping once a month with her mother (*id*. at 506, 507, 508).  Because she experienced panic

and anxiety when she went out alone, she was not able to do laundry, drive a car, or socialize

outside her home (*id.* at 507-08, 509-10).  She ate meals or watched movies with others at her

home three times a week (*id.* at 509).  PA-C Puzankov indicated that anxiety, depression, and

panic attacks impaired Plaintiff's ability to comprehend, concentrate, follow spoken instructions,

handle stress, and adapt to changes in routine (*id.* at 510-11).  The form indicates that she was

fired from her job at McDonald's because she had a conflict with her supervisor (*id.* at 511).

PA-C Puzankov completed a second assessment – a Mental Impairment Questionnaire –

on June 5, 2014 (*id.* at 979-82).  At that time, she "usually" saw Plaintiff every three months (id.

at 979).  Plaintiff had exhibited "mild improvement" over the course of her treatment (*id.*).  PA-C

Puzankov described Plaintiff as exhibiting somewhat anxious/restless behavior (*id.*).  Her

personal hygiene was minimal at times (*id.*).  She scored 28/30 on the Folstein mini-mental

status exam (*id.*).  She lost one point for the attention and calculation question and one point

because she was unable to identify the name of the county in which she resided (*id.* at 1307).

PA-C Puzankov assessed the following functional limitations:  (1) marked restrictions of

activities of daily living; (2) marked difficulties in maintaining social functioning; (3) moderate

difficulties in maintaining concentration, persistence or pace; and (4) one or two episodes of

decompensation within a twelve-month period, each of at least two weeks duration (*id.* at 981). [7] PA-C Puzankov opined that Plaintiff's impairments would cause her to be absent from work about two days per month (*id.* at 982). She diagnosed general anxiety disorder, insomnia, and major depression and assigned a GAF score of 41-50 (*id.* at 979).

On May 15, 2015, PA-C Puzankov completed a Massachusetts Emergency Assistance to the Elderly, Disabled, and Children ("EAEDC") benefit form (*id.* at 1299-1305). PA-C Puzankov indicated that Plaintiff's mood and affect were "pleasant, appropriate, communicative," her thought processes were normal, but she exhibited social anxiety, a fear of public places, and an inability to concentrate (*id.* at 1302). Her mental health conditions, including acute anxiety and major depression, interfered with her ability to perform some activities of daily living (*id.* at 1302, 1304). According to PA-C Puzankov, Plaintiff's mental health impairment affected her ability to work and was expected to last six to twelve months (*id.* at 1305).

Tina Newcomb, LMFT, of the Carson Center authored an undated letter after May 6, 2015 indicating that Plaintiff's "anxiety and depression prevent[ed] her from maintaining a job, participating in activities in the community and attending to her personal needs" (*id.* at 1045).

---

[7] "'Episodes of decompensation' are defined as 'exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace.'" *Velasquez v. Astrue*, Civil Action No. 10-10765-DPW, 2011 WL 3654433, at *7 (D. Mass. Aug. 18, 2011) (quoting 20 C.F.R. Pt. 404 Subpt. P, Appx. 1, Listing 12.00(C)(4)). According to the regulations, "[t]he phrase 'repeated episodes of decompensation, each of extended duration' is defined as three episodes in one year, or an average of one over four months, each lasting at least two weeks." *Id.* (quoting Listing 12.00(C)(4)). Although Plaintiff was transferred from the Noble Hospital to a psychiatric facility in July 2011 (A.R. at 631), the Administrative Record does not contain the records of that hospitalization and Plaintiff does not identify other evidence of an "episode of decompensation."

This opinion was based on Plaintiff's emotional breakdowns "in which she isolates for days, fails to take care of herself and experiences crying spells and panic attacks" (*id.*).

APRN Sussman of the Carson Center completed a Mental Impairment Questionnaire on October 25, 2016 after she had treated Plaintiff for about thirteen months (*id.* at 1458-61). The severity of Plaintiff's impairments was manifested by her skin picking, panic attacks, ruminative thoughts, depressed mood, fatigue, and low energy (*id.* at 1458). Ms. Sussman identified the following signs and symptoms: a pervasive loss of interest in almost all activities; impaired impulse control; generalized persistent anxiety; difficulty thinking or concentrating; sleep disturbance; easy distractibility; and recurrent severe panic attacks (*id.* at 1459). Although Ms. Sussman indicated that Plaintiff did not have a low IQ or reduced intellectual functioning, she assessed Plaintiff's functional limitations as: (1) marked restrictions of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence or pace; and (4) one or two episodes of decompensation within a twelve-month period each of at least two weeks duration (*id.* at 1460). Plaintiff had an "anxiety related disorder and complete inability to function independently outside the . . . home" (*id.* at 1461). Ms. Sussman estimated that Plaintiff's impairments would cause her to be absent from work more than four days per month (*id.*). She diagnosed general anxiety disorder, PTSD, OCD, anorexia nervosa, and mild opioid use disorder and indicated the prognosis was "chronic treatment resistant depression" (*id.* at 1458).[8]

*State Agency Consultants*

---

[8] Ms. Sussman did not assign a GAF score, although the form included spaces for a current score and the highest score during the past year (A.R. at 1458).

On November 12, 2012, Peter Robbins, Ed.D. conducted a Psychiatric Review Technique ("PRT") assessment based on a review of Plaintiff's records (*id.* at 201-02). Dr. Robbins opined that Plaintiff had mild restrictions of daily living activities, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and one or two repeated episodes of decompensation, each of extended duration (*id.*). Dr. Robbins' mental RFC assessment indicated that Plaintiff did not have limitations for understanding and memory, social interactions, or adaptation (id. at 204). But because anxiety limited Plaintiff's ability to sustain concentration and to perform at a consistent pace, Dr. Robbins opined that she had moderate deficits in the ability to carry out detailed instructions, maintain attention and concentration for extended periods, and complete a normal workday and workweek without interruptions from psychologically based symptoms (*id.* at 204-05). Dr. Robbins concluded that Plaintiff would be able to sustain adequate pace, persistence, and concentration for simple work tasks and was not disabled (*id.* at 204, 207).

Ginette Langer, Ph.D. conducted a reconsideration evaluation on March 7, 2013 (*id.* at 210, 219-20). She opined that Plaintiff's anxiety disorders and substance addiction disorders were severe and caused mild restriction of daily living activities, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and one or two episodes of decompensation, each of extended duration (*id.* at 219-20). Like Dr. Robbins, Dr. Langer indicated that Plaintiff did not have memory limitations, but had the sustained concentration and persistence limitations Dr. Robbins identified (*id.* at 222). However, Dr. Langer disagreed with Dr. Robbins' opinions regarding Plaintiff's limitations in social interaction and adaptation (*id.* at 204, 222-23). Dr. Langer opined that Plaintiff was markedly limited in her ability to appropriately interact with the general public and was

20

moderately limited in her ability to respond to changes in the work setting (*id.* at 222-23).
Ultimately, Dr. Langer determined that Plaintiff could perform jobs that existed in the national
and regional economies and, therefore, was not disabled (*id.* at 224-25).

D.    The ALJ Hearing

Plaintiff and independent vocational expert ("VE") Michael Dorval testified at the
hearing before the ALJ on November 8, 2016 (*id.* at 109).  Plaintiff described the pain in her
lower back and her mental condition.

Plaintiff testified that she occasionally suffered from low back pain, but had not received
treatment for her back condition during the past two years (*id.* at 129-30).  She used a heating
pad and over-the-counter medication when she experienced discomfort (*id.*).

Plaintiff visited her therapist at the Carson Center every other week and saw the
psychologist for medication once a month (*id.* at 114).  She still went to OnCall for Suboxone
treatment once every three weeks but no longer saw a therapist there (*id.* at 114, 117).

Plaintiff testified that her mental impairments prevented her from working (*id.* at 113).
Her condition was "getting worse" and the medications were not working (*id.* at 113, 125, 128).
According to Plaintiff, she could not work even if she did not have contact with people because
her symptoms, including panic attacks, were present irrespective of whether she was alone or
among the public (*id.* at 119, 123).  She calmed herself by sitting down, putting her head back,
closing her eyes, and breathing (*id.* at 125-26).  She cut and picked the skin on one thumb and
experienced insomnia (*id.* at 126).  She had difficulty concentrating (*id.* at 127).

Plaintiff described herself as "never happy" (*id.* at 121-22).  She felt "empty, sad," and
constantly nervous (*id.* at 121).  She cried, shook, and had sweaty palms (*id.*).  Her depression
had increased because she was not able to "do much" (*id.*).

She lived with her mother's fiancé and was able to cook for herself and to clean the bathroom (*id.* at 115-16, 120, 127).  Her mother did her laundry because it involved going out in public to the laundromat (*id.* at 116).  She attempted to go to the grocery store with her mother every week but often she had to leave the store and wait for her mother in the car (*id.* at 116, 118-19, 128).  With the exception of her treatment appointments, she did not attempt to go other places (*id.* at 128).  When she was at home, she colored in coloring books and watched TV (*id.* 119).  Her mother and son visited (*id.* at 120).

In order to elicit the VE's opinion of whether Plaintiff could perform her past job as a phlebotomist or jobs that existed in the regional and national economy, the ALJ asked the VE to assume a person with Plaintiff's age, education, and work experience who could engage in unskilled work with low stress, which was defined as "occasional changes in the work setting" (id. at 132).  There would be no interaction with the public (*id.* at 132).  In addition, the work would be limited to dealing with things rather than people (*id.*).  According to the VE, the hypothetical person could not do Plaintiff's past work, but could hold the following jobs that are performed at night when few people are present:  stock laborer (like stocking shelves in a supermarket); and laundry worker in a hotel or hospital (*id.*).  However, no jobs would be available to the person described in the hypothetical who was either absent more than two days a month or off task fifteen percent of the time (*id.* at 133).

E.    The ALJ's Decision

In determining whether Plaintiff was disabled, the ALJ conducted the five-part analysis required by the regulations.  *See* 20 C.F.R. § 404.1520(a)(4)(i-v); *see also Goodermote*, 690 F.2d at 6-7.  At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date of October 31, 2009 (A.R. at 87).  *See* 20 C.F.R. § 404.1571 *et*

*seq.* At step two, the ALJ found that Plaintiff had the following severe impairments: anxiety

disorder; panic disorder; depression; and history of substance abuse disorder in remission (A.R.

at 87). *See* 20 C.F.R. § 404.1520(c). The ALJ found that Plaintiff's low back pain due to

degenerative disc disease was not a severe impairment based on Plaintiff's hearing testimony and

the medical evidence and opinions (A.R. at 88). For purposes of step three, the ALJ reviewed

Plaintiff's mental impairments and the related "paragraph B" and "paragraph C" criteria, and

determined that her impairments, either alone or in combination, did not meet or medically equal

the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (*id.* at

89-90). *See* 20 C.F.R. §§ 404.2520(d), 404.1525, 404.1526.

Before proceeding to steps four and five, the ALJ assessed Plaintiff's RFC for use at step

four to determine whether she could perform past relevant work and, if the analysis continued to

step five, to determine if she could do other work. *See* 20 C.F.R. § 404.1520(e). The ALJ

determined that the Plaintiff had the RFC to perform the full range of work at all exertional

levels, with the following non-exertional limitations:

> unskilled work[9] . . . low stress [meaning] occasional changes in the work setting . . . no
> interaction with the public and . . . dealing with things rather than people.

(A.R. at 90). At step four, the ALJ found that Plaintiff was not able to perform her past relevant

work (*id.* at 98). *See* 20 C.F.R. § 404.1565. However, considering Plaintiff's age, education,

work experience, and RFC, Plaintiff could perform the jobs of laborer/stocking (night) and

laundry worker, which existed in the national and regional economies (A.R. at 98-99). *See* 20

---

[9] "'Unskilled work is work which needs little or no judgment to do simple duties that can be
learned on the job in a short period of time.'" *Auger v. Astrue*, 792 F. Supp. 2d 92, 96 n.7 (D.
Mass. 2011) (quoting 20 C.F.R. § 416.968(a)).

C.F.R. §§ 404.1569, 404.1569(a). Consequently, on December 30, 2016, the ALJ concluded that Plaintiff was not disabled since the date of her application, October 31, 2009 (A.R. at 99). *See* 20 C.F.R. § 404.1520(g).

IV. ANALYSIS

A. **The ALJ's step two determination -- that Plaintiff's back condition was not a severe impairment -- was supported by substantial evidence.**

The ALJ first found that Plaintiff was not disabled on January 30, 2015 (A.R. at 289). Plaintiff asked the Appeals Council to review the decision. On review, based on the authority granted to it under 20 C.F.R. §§ 404.977 and 416.1477, the Appeals Council cited deficiencies in the ALJ's assessment of Plaintiff's RFC based on her severe mental impairments, vacated the initial decision, and remanded the case to the ALJ with instructions that she:

- Give further consideration to the claimant's maximum [RFC] during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations (Social Security Ruling 96-8p).

- If warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Ruling 83-14). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 C.F.R. 404.1566 and 416.966). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

(A.R. at 297).

At step two of her initial decision, the ALJ found that Plaintiff's low back pain due to degenerative disc disease was a severe impairment and determined that Plaintiff had the RFC to perform light work (*id.* at 270, 271). In the ALJ's second decision, issued in December 2016

after remand from the Appeals Council, the ALJ found that Plaintiff's back impairment was non-severe and that she had the RFC "to perform a full range of work at all exertional levels" (*id.* at 88, 90). The ALJ did not obtain any significant new medical evidence or opinions between the first and second decisions. Plaintiff contends that the ALJ erred as a matter of fact when she stated that Plaintiff did not testify about her back pain during the second hearing and erred as a matter of law when the ALJ, without explanation, changed her opinion of the severity of Plaintiff's back condition (Dkt. No. 13 at 8-10). Contrary to the ALJ's finding, Plaintiff briefly testified about her back pain and the corresponding limitations on her activities (A.R. at 88, 129-30). Inasmuch as the ALJ followed the proper procedure in her second decision and supported her step two determination with substantial evidence, however, the factual inaccuracy does not provide a basis to disturb the ALJ's decision regarding Plaintiff's back.

"On remand, an ALJ 'shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's order.'" *Cook v. Berryhill*, CIVIL ACTION NO. 14-40110-DHH, 2017 WL 1135221, at *11 (D. Mass. Mar. 27, 2017) (quoting 20 C.F.R. § 404.977(b); citing *Ellis v. Colvin*, 29 F. Supp. 3d 288, 300 (W.D.N.Y. 2014) (holding that a failure to follow the Appeals Council's instructions is legal error even if the Appeals Council affirms the ALJ's subsequent decision)). "An ALJ's decision on the merits of a disability application does not become final and binding if the Appeals Council vacates that decision and remands the matter for further proceedings." *Kearney v. Colvin*, 14 F. Supp. 3d 943, 949 (S.D. Ohio 2014) (citing *Wireman v. Comm'r of Soc. Sec.*, 60 Fed. App'x 570, 570 (6th Cir. 2003)). "An ALJ tasked with deciding a remanded claim is not bound by prior conclusions or findings if those conclusions or findings have not been adopted by the Appeals Council." *Dacosta v. Berryhill*, Case No. 3:17-cv-30085-KAR, 2019 WL 404039, at *11 (D.

Mass. Jan. 31, 2019). *Cf. Nichols v. U.S. Soc. Sec. Admin., Acting Comm'r*, Case No. 16-cv-443-PB, 2018 WL 1307645, at *5 (D.N.H. Mar. 13, 2018) (when an ALJ's decision was vacated and the case was remanded to a different ALJ, the second ALJ was not bound in any way by the findings and conclusions of the first ALJ to whom the case was initially assigned; citing cases). "On the contrary, when an initial ALJ's decision is vacated and remanded by the Appeals Council, as here, the ALJ is typically directed to issue a 'new decision' after offering the claimant 'a new hearing.'" *Id.* (citing HALLEX I-2-8-18(A), 1993 WL 643058 (S.S.A. May 26, 2017)). "[A]s long as [her] decision is supported by substantial evidence, an ALJ's failure to explain why or how [her] RFC finding deviates from that of a since vacated, prior decision does not constitute a viable basis for reversal." *Id.* (citing cases); *see also Boardway v. Berryhill*, Case No. 3:17-cv-30069-KAR, 2018 WL 4323823, at *16 (D. Mass. Sept. 10, 2018) (on remand, the ALJ was not bound by her prior assessment of a physician's opinion; citing 20 C.F.R. § 404.955(a)). Because the ALJ did not commit an error of law by revising her finding as to the severity of Plaintiff's back condition and because the ALJ's finding that Plaintiff's back condition was non-severe was supported by substantial record evidence, Plaintiff is not entitled to a remand "for another Hearing for clarification on this issue" (Dkt. No. 13 at 10).

The objective medical evidence and opinions supported the ALJ's determination that Plaintiff had no exertional limitations due to the condition of her spine (A.R. at 88). Indeed, Plaintiff's hearing testimony -- that that she had not received treatment for her back condition in the past two years and took Tylenol and applied heat for occasional discomfort -- supported the ALJ's decision (*id.* at 88, 129-30). The October 2014 MRI of Plaintiff's spine showed a "small posterior right paramedian disc protrusion that approaches without compressing the traversing right S1 nerve root within the right subarticular zone" (*id.* at 88, 1038). The other disc levels of

the lumbar spine were normal (*id.*).  These results corroborated those of the earlier radiographs (*id.* at 88, 614, 862, 887, 893).  Dr. Lagac, a consultant who examined Plaintiff's back in November 2012, noted full range of motion in cervical spine flexion, extension, rotation, and lateral bending (*id.* at 88, 839).  Dr. Poirier, a state agency non-examining consultant, determined, based on a review of the records, that Plaintiff's spine condition was non-severe and that she had the RFC for "heavy/very heavy" work (*id.* at 88, 219, 224).  Based on the absence of any objective evidence to support Plaintiff's claim of "chronic" back pain, PA-C Puzankov of Family Medical opined that Plaintiff did not have any exertional impairments that limited her ability to perform work-related activities (*id.* at 88, 976-77).  PA-C Puzankov's treatment record of February 29, 2016 indicates that Plaintiff walked three to six hours a week for exercise (*id.* at 1137).  This note, which was not included in the record when the ALJ issued her first decision in January 2015, further supports the ALJ's second step two and RFC determinations.

Even if the condition of Plaintiff's spine was a severe impairment at step two, which it was not, the failure to include it in the listing of severe impairments was harmless.  Because step two's "severity requirement is . . . a *de minimus* policy, designed to do no more than screen out groundless claims," *McDonald v. Sec'y of Health & Human Servs.,* 795 F.2d 1118, 1124 (1st Cir. 1986), the ALJ's finding that Plaintiff had other severe impairments is all that step two required as long as the ALJ considered all of Plaintiff's functional limitations in crafting the RFC (A.R. at 87).  *See Heatley v. Comm'r of Soc. Sec.,* 382 F. App'x 823, 824-25 (11th Cir. 2010); *Coe v. Colvin,* Civil Action No. 15-30037-MGM, 2016 WL 3350995, at *6 (D. Mass. June 15, 2016). The ALJ noted that the RFC for unskilled work, in part, reflected her finding that Plaintiff would be distracted by back pain (A.R. at 88).

Because the ALJ's determination that the condition of Plaintiff's spine was a non-severe impairment at step two is supported by substantial evidence and because she addressed any functional limitations caused by back pain in the RFC, remand is not warranted.

**B.**   **The ALJ was not required to afford controlling weight to APRN Sussman's opinion.**

Plaintiff next complains that the ALJ erred when determining her RFC by assigning "little weight" to the opinion of APRN Sussman of the Carson Center while assigning "significant weight" to the opinion of LMHC Saunders of OnCall (Dkt. No. 13 at 10-14). Plaintiff essentially argues that there is record evidence (Ms. Sussman's opinion) that supports a finding of disability (*id.*).   As it is well-settled that "the resolution of conflicts in evidence is the role of the hearing officer, not the [c]ourt, it is only necessary to determine whether there is substantial evidence to support the hearing officer's conclusions." *Green v. Astrue,* 588 F. Supp. 2d 147, 153 (D. Mass. 2008) (citing *Irlanda Ortiz v. Sec'y of Health & Human Servs.,* 955 F.2d 765, 769 1st Cir. 1991)).   Substantial evidence supports the ALJ's decision that Plaintiff was not disabled.

First, Ms. Sussman was not an acceptable medical source whose opinion was entitled to controlling weight.   "[B]ecause a nurse, such as [Ms. Sussman] was 'not among the "acceptable medical sources" listed in 20 C.F.R. [§§ 404.1502,] 416.902,' [Ms. Sussman] is not a treating source whose opinion was presumptively entitled to controlling weight." *Taylor v. Colvin* (*Taylor II*), Civil Action No.15-30183-KAR, 2016 WL 6778214, at *4 (D. Mass. Nov. 15, 2016) (quoting *Taylor v. Astrue* (*Taylor I*), 899 F. Supp. 2d 83, 88 (D. Mass. 2012) (citing SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006)); *see also, e.g., Johnson v. Colvin*, CIVIL ACTION NO. 13-40003-TSH, 2016 WL 4639134, at *9 (D. Mass. Sept. 6, 2016).

Nonetheless, because Ms. Sussman was a "treating source," the ALJ was required to consider her opinion and explain the weight she assigned to it.  *See Taylor I*, 899 F. Supp. 2d at 88 (citing SSR 06-03p, 2006 WL 2329939, at *6 (Aug. 9, 2006) (an ALJ generally should explain the weight given to opinions from treating medical sources whose opinions are not presumptively controlling)); *see also Johnson*, 2016 WL 4639134, at *9 (opinions of "other medical sources" are not entitled to controlling weight; an ALJ is not required to provide "good reasons" for the weight assigned to such opinions, but cannot ignore and must adequately explain the treatment of opinions from such other medical sources).  Generally, an ALJ should give

> more weight to medical opinions from [the claimant's] treating sources, since these
> sources are likely to be the medical professionals most able to provide a detailed,
> longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique
> perspective to the medical evidence that cannot be obtained from the objective medical
> findings alone or from reports of individual examinations, such as consultative
> examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2).  "However, a treating source's opinion will only be given controlling weight if it is (1) well-supported by medically accepted clinical and laboratory diagnostic techniques and (2) not inconsistent with substantial evidence in the claimant's case record."  *Reyes v. Astrue*, Civil Action No. 11-30197-KPN, 2012 WL 2178963, at *3 (D. Mass. June 13, 2012) (citing 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)).  "If a treating source's opinion *is* inconsistent with other substantial evidence in the record, the conflict is for the [ALJ] — not the court — to resolve."  *Id.* (citing *Selig v. Astrue,* Civil Action No. 10-10944-RGS, 2011 WL 1627351, at *5 (D. Mass. Apr. 29, 2011)).

On the Mental Impairment Questionnaire, Ms. Sussman diagnosed Plaintiff with generalized anxiety disorder, PTSD, OCD, anorexia nervosa, mild opioid use disorder, and chronic treatment-resistant depression (A.R. at 95, 1458).  She found the Plaintiff had marked limitations in activities of daily living, social functioning, and concentration, persistence and

pace and had had one to two episodes of decompensation of extended duration (*id.* at 95, 1460).

She further opined that Plaintiff had an "anxiety related disorder and complete inability to

function independently outside the . . . home" (*id.* at 95, 1461). According to Ms. Sussman,

Plaintiff would be absent from work more than four days per month (*id.*).

Contrary to Plaintiff's claim, the ALJ did not ignore Ms. Sussman's opinion (Dkt. No. 13

at 14). Instead, the ALJ assigned it little weight because, as the ALJ explained, it was

inconsistent with other substantial record evidence (A.R. at 96). According to the ALJ,

> [the] opinion statement[] [is] highly inconsistent with the objective evidence on record, in
> particular from Dr. Hutt, Dr. Estes, and Elizabeth Saunders LMHC, all of which assigned
> [GAF] scores ranging from 54 to 70 and noted only modest findings on examination. In
> fact, treating source Elizabeth Saunders LMHC noted no difficulties with daily
> functioning and an ability to sustain concentration and attention for extended periods.
> There was no evidence on record of any episodes of decompensation of extended
> duration. Therefore, little weight is assigned.

(*id.*).

Plaintiff takes issue primarily with the ALJ's reliance on Ms. Saunders' opinion when the

ALJ explained the weight she was assigning to Ms. Sussman's opinion (Dkt. No. 13 at 13-14).

The resolution of the discrepancies between Ms. Sussman's and Ms. Saunders' opinions was "the

province of the ALJ, not this [c]ourt." *Ekenavie v. Berryhill*, C.A. No. 16-535 WES, 2018 WL

1626102, at *6 (D.R.I. Apr. 2, 2018) (citing *Greene v. Astrue*, Civil Action No. 11–30084–KPN,

2012 WL 1248977, at *3 (D. Mass. Apr. 12, 2012)). Without citation to authority, Plaintiff

argues that the ALJ should not have relied on Ms. Saunders' opinion because she was Plaintiff's

"former therapist at her Suboxone program, who did not treat her for mental health" (*id.* at 13).

Although Ms. Saunders saw Plaintiff at OnCall where Plaintiff received Suboxone treatment,

Ms. Saunders was a licensed mental health counselor ("LMHC") who had counseled Plaintiff for

almost two years by January 2013 when she completed the substance abuse and psychiatric

disorder questionnaires (A.R. at 849, 850-52). *See* SSR 06-03p, 2006 WL 2329939, at *2 (the

ALJ can consider evidence from "medical sources" such as "therapists"). Ms. Saunders, who

was aware that Plaintiff's PCP was treating her for anxiety, indicated that Plaintiff's

psychological symptoms did not interfere with her ability to: carry out activities of daily living,

including engaging in social relationships; complete tasks on time; adhere to a regular routine;

and sustain concentration and attention for extended periods (A.R. at 849, 850). Ms. Saunders

also noted that Plaintiff could remember work-like tasks and instructions, work independently

without excessive supervision, and respond appropriately to supervisors and co-workers (*id.* at

850-51). *See* SSR 96-8p, 1996 WL 374184, at *6 ("Work-related mental activities generally

required by competitive, remunerative work include the abilities to: understand, carry out, and

remember instructions; use judgment in making work-related decisions; respond appropriately to

supervision, co-workers and work situations; and deal with changes in a routine work setting.").

Because Ms. Saunders was a "treating source" who "had a history of treating [Plaintiff] and was

personally familiar with [her] conditions," and because Ms. Saunders' opinion was consistent

with the "longitudinal record as a whole," including Dr. Hutt's and Dr. Estes' opinions, the ALJ

properly assigned it significant weight (*id.* at 94). *See* 20 C.F.R. § 404.1527(c)(2)(i), (f)(1) (the

length of the treatment relationship and the frequency of examination are factors to be considered

when assigning weight to the opinion of a treating source who is not an acceptable medical

source); *see also* SSR 06-03p, 2006 WL 2329939, at *3.

Even if the ALJ should have ignored Ms. Saunders' opinion, and there is no basis for that

determination, it is notable that Plaintiff does not challenge the consultants' opinions upon which

the ALJ also relied in assessing Ms. Sussman's opinion (A.R. at 96). The conclusions of Dr.

Hutt, who examined Plaintiff twice, and Dr. Estes, were inconsistent with Ms. Sussman's view

that Plaintiff's mental impairments caused marked functional limitations (*id.* at 841-44, 855-58, 984-88). *See Reyes*, 2012 WL 2178963, at *3. The consultants assessed Plaintiff's speech as being clear and coherent (*id.* at 843, 856, 986). Her memory was not impaired (*id.* at 844, 857, 987). Plaintiff scored within the normal range (30/30) on the mini-mental status examination Dr. Estes administered (*id.* at 987). The examiners noted that Plaintiff was in the average to low average range of intellectual functioning and they assessed her ability to concentrate as fair (*id.* at 843-44, 857, 987). Dr. Estes opined that Plaintiff did not "require any particular levels of supervision" and was able to "live independently in the community" (*id.* at 987). Plaintiff's affect was appropriate and her mood was "mildly dysphoric" and anxious during the evaluations (*id.* at 844, 857, 986). The consultants noted her history of panic attacks (*id.* at 843, 856, 984-85). Notwithstanding Plaintiff's statement that she was experiencing a panic attack during Dr. Hutt's first evaluation, Dr. Hutt did not observe symptoms consistent with Plaintiff's declaration (*id.* at 841, 843). The ALJ could properly ignore Dr. Hutt's skepticism concerning Plaintiff's ability to "psychologically tolerate stressors associated with full-time employment" because it was inconsistent with the GAF scores of 60 and 65-70 that Dr. Hutt assigned (*id.* at 844, 857). Further, an opinion as to disability is within the Commissioner's sole purview. *See Gregory T. v. Berryhill*, No. 1:17-cv-00445-LEW, 2018 WL 6012222, at *7 (D. Me. Nov. 16, 2018), *adopted sub nom. Gregory T. v. Soc. Sec. Admin. Comm'r*, Civil no. 1:17-cv-00445-LEW, 2018 WL 6310056 (D. Me. Dec. 3, 2018) ("an opinion as to whether a claimant can work full-time is an opinion reserved to the commissioner") (citing 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1) ("A statement by a medical source that [the claimant is] 'disabled' or 'unable to work' does not mean that [the SSA] will determine that [the claimant is] disabled.")).

The ALJ also pointed to Plaintiff's GAF scores that Dr. Hutt, Dr. Estes, and Ms. Saunders assigned as support for her rejection of Ms. Sussman's opinion and conclusion that Plaintiff's mild to moderate impairments rendered her capable of engaging in unskilled work (A.R. at 98). Although the GAF scale was not included in DSM-V, the newest edition of the DSM, the SSA "has indicated that it will continue to receive into evidence and consider GAF scores." *Blais-Peck v. Colvin,* Civil Action No. 14-cv-30084-KAR, 2015 WL 4692456, at *1 n.3 (D. Mass. Aug. 6, 2015) (citing SSA Administrative Memorandum 13066 (July 22, 2013)). "Further, courts have not disavowed the GAF scale as a measurement of one's mental capacity: 'Although ALJs "cannot draw reliable inferences from the difference in GAF ratings assigned by different clinicians or from a single GAF score in isolation," they can continue to "consider GAF scores just as [they] would other opinion evidence, [although] scores must have supporting evidence to be given significant weight."'" *Lopez-Lopez*, 138 F. Supp. 3d at 111 (quoting *Mendes v. Colvin,* Civil Action No. 14-12237-DJC, 2015 WL 5305232, at *8 (D. Mass. Sept. 10, 2015)).

Dr. Hutt, Dr. Estes, and Ms. Saunders assigned GAF scores ranging from 54 to 70 (A.R. at 844, 850, 857, 988). "A GAF score of 61 to 70 is indicative of some mild symptoms or some mild difficulty in social or occupational functioning; a GAF score of 51 to 60 is indicative of moderate symptoms or moderate difficulty in social or occupational functioning; . . . ." *Dacosta*, 2019 WL 404039, at *3 n.3 (citing DSM IV at 34). The ALJ relied on the findings of Dr. Hutt, Dr. Estes, and Ms. Saunders, which were discussed earlier, as support for taking the GAF scores into account. *See Lopez-Lopez,* 138 F. Supp. 3d at 111; *Bourinot v. Colvin*, 95 F. Supp. 3d 161, 178 (D. Mass. 2015) (citing *Kroh v. Colvin,* Civil Action No. 3:13-CV-01533, 2014 WL 4384675, at *18 (M.D. Pa. Sept. 4, 2014)). Based on the opinion evidence in the record, the RFC appropriately limited Plaintiff to unskilled work with additional restrictions (A.R. at 90).

"[S]ince the . . . reports indicate that claimant was at the most moderately limited in areas of functioning required for unskilled work, . . . they adequately substantiate the ALJ's finding that claimant's mental impairment did not affect, more than marginally, the relevant occupational base." *Falcon-Cartagena v. Comm'r of Soc. Sec.*, 21 F. App'x 11, 14 (1st Cir. 2001). *See Ortiz v. Sec'y of Health & Human Servs.*, 890 F.2d 520, 527 (1st Cir. 1989) ("In light of these 'moderate' restrictions . . . apart from [the claimant] being relegated to jobs of an unskilled nature, 'the claimant's capacity for the full range of light work was not *significantly* compromised by his additional nonexertional limitations.'"); *Perry v. Astrue*, Civil Action No. 11-40215-TSH, 2014 WL 4965910, at *6 (D. Mass. Sept. 30, 2014) ("[a] finding of moderate limitations in maintaining concentration, persistence, or pace, does not necessarily preclude the performance of unskilled work.").

Finally, the ALJ relied on the treatment records of Family Medical, OnCall, and the Carson Center and Dr. Langer's assessment of Plaintiff's mental RFC to support the assignment of "little weight" to Ms. Sussman's opinion (A.R. at 94, 95, 98). The October 2011, July 2014, and April and May 2015 records of Family Medical indicate that Plaintiff's anxiety and depression were controlled by medication (*id.* at 696, 1006, 1125, 1131). In July 2016, PA-C Puzankov noted that Plaintiff's anxiety and depression were "stable" (*id.* at 1239). The OnCall records from 2012 through 2016 indicate that Plaintiff's affect was "normal," and she was "awake, alert, oriented, cooperative," and "well appearing" (*id.* at 864, 906, 909, 915, 927, 956, 1316, 1328, 1373, 1418, 1433, 1452-53). Although Plaintiff occasionally reported that she was anxious, there were no consistent complaints of anxiety in OnCall's treatment records (*see, e.g., id.* at 1412). Dr. Langer's assessment -- that Plaintiff was not disabled notwithstanding moderate limitations in her ability to concentrate and adapt to changes in the work setting and a marked

limitation in her ability to interact with the public – was also inconsistent with Ms. Sussman's opinion (*id.* at 222-25). Indeed, even Ms. Sussman's treatment notes contradicted her opinion of Plaintiff's limitations. *See Bourinot,* 95 F. Supp. 3d at 176 (the inconsistency between a treatment provider's opinion and treatment notes permitted the ALJ to discount the treating physicians' opinions); *Rivera v. Astrue,* 814 F. Supp. 2d 30, 38 (D. Mass. 2011) (affirming the ALJ's decision not to give claimant's treating clinician's opinion controlling weight because it was inconsistent with the clinician's own treatment notes). Ms. Sussman recorded Plaintiff's report that the higher dosages of Klonopin and Prozac had improved her anxiety and depression (*id.* at 1223, 1229). During Plaintiff's June 13, 2016 and September 16, 2016 visits to the Carson Center, Ms. Sussman observed that Plaintiff was euthymic, "[c]alm, cooperative, [and] engaged" and her thoughts were "coherent [and] organized" (A.R. at 1226, 1489). Thus, ample evidence supported the ALJ's assessment of Ms. Sussman's opinion.

Even if the record would support a different result, the ALJ thoroughly reviewed the record evidence and explained the weight she assigned to the opinions. By restricting Plaintiff to unskilled work with occasional changes in the work setting, no interaction with the public, and working with "things, not people," the ALJ crafted an RFC that accounted for Plaintiff's non-exertional limitations that were supported by substantial evidence (*id.* at 90, 98). *See Applebee,* 744 F. App'x at 6 ("While the record arguably could support a different conclusion, there is clearly substantial evidence to support the ALJ's findings.") (citing *Rodriguez Pagan v. Sec'y of Health & Human Servs.,* 819 F.2d 1, 3 (1st Cir. 1987) (per curiam)).

V.    CONCLUSION

For the above-stated reasons, Plaintiff's Motion for Judgment on the Pleadings (Dkt. No. 12) is DENIED and the Commissioner's Motion for an Order Affirming the Decision of the Commissioner (Dkt. No. 21) is GRANTED.  The case will be closed.

It is so ordered.

Dated:  March 29, 2019                                    /s/ Katherine A. Robertson
                                                         KATHERINE A. ROBERTSON
                                                         U.S. MAGISTRATE JUDGE